**Milan M. VUITCH, et al., Appellants,**

v.

**Andrea FURR, Appellee.**

**No. 82–1077.**

District of Columbia Court of Appeals.

Argued Feb. 2, 1984.

Decided Oct. 16, 1984.

Joanne Hustead, Fairfax, Va., for appellants.

Gerard E. Mitchell, Washington, D.C., for appellee.

Before NEWMAN, Chief Judge, and NEBEKER and ROGERS, Associate Judges.

ROGERS, Associate Judge:

■ This is an appeal from the denial of a motion for a directed verdict in a civil action brought by appellee against Dr. Vuitch, Mrs. Vuitch, Laurel Clinic, Inc. and Laurel Hospital, Inc. for injuries she suffered from a second trimester abortion and post-operative treatment performed by Dr. Vuitch at the Laurel Clinic. The issue on appeal is whether appellants' motion for a directed verdict was properly denied on the issues of (1) piercing the corporate veils of Laurel Clinic and Laurel Hospital, (2) Mrs. Vuitch's individual liability as a corporate officer, and (3) malpractice by Dr. Vuitch. Upon review of the record, we hold that there was sufficient evidence on these issues and no error by the trial court in denying the motion for a directed verdict.[1] Accordingly, we affirm.[2]

I.

■ The law applicable to review of a denial of a motion for directed verdict in this jurisdiction is clear:

[T]he evidence must be reviewed most favorably to the party against whom the motion is made, and that party must be given the benefit of all reasonable inferences from the evidence.

---

1. Because we affirm the denial of the directed verdict on the issue of piercing the corporate veils, we do not reach the issue of whether corporate officers can be held liable for civil conspiracy.

2. Appellants did not make a motion for judgment notwithstanding the verdict, Super.Ct. Civ.R. 50(b), and therefore, this court is without power to direct entry of a judgment for appellants as they request. *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 217–18, 67 S.Ct. 752, 755–56, 91 L.Ed. 849 (1947); *S. Kann's Sons Corp. v. Hayes*, 320 A.2d 593, 596 (D.C.1974).

*Corley v. B.P. Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979) (citing *St. Paul Fire & Marine Insurance Co. v. James G. Davis Construction Corp.*, 350 A.2d 751, 752 (D.C.1976)). This standard of review on appeal is identical to the standard applied by the trial court. *Gaither v. District of Columbia*, 333 A.2d 57, 59 (D.C.1975) (citing *Calloway v. Central Charge Service*, 142 U.S.App.D.C. 259, 440 F.2d 287 (1971)). With the evidence viewed in this manner, a verdict will be directed only when the evidence is so clear that reasonable men could reach but one opinion. *Corley v. B.P. Oil Corp., supra*, 402 A.2d at 1263 (quoting *Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973)). In so viewing the evidence, the court "must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting its judgment for that of the jury." *Corley v. B.P. Oil Corp., supra*, 402 A.2d at 1263 (citing *Yazzie v. Sullivent*, 561 F.2d 183, 188 (10th Cir.1977)); *Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43, 46 (D.C.1980). If reasonable men could differ on the outcome of the case, it must be sent to the jury. *Corley v. B.P. Oil Corp., supra*, 402 A.2d at 1263 ("where ... the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury") (quoting *Aylor v. Intercounty Construction Corp.*, 127 U.S.App.D.C. 151, 155, 381 F.2d 930, 934 (1967)); *Johnson v. Weinberg*, 434 A.2d 404, 407–08 (D.C.1981).

Viewing the evidence most favorably to appellee reveals that Dr. Vuitch performed a dilation and curettage abortion on Andrea Furr on Thursday, January 8, 1981, at the Laurel Clinic, Inc., 1712 Eye Street, Northwest in the District of Columbia. In the course of performing the abortion, he lacerated Ms. Furr's uterine wall. Dr. Vuitch attempted to suture the laceration and kept her overnight at the Clinic despite his knowledge that the statute under which the

Clinic is licensed, the D.C. Ambulatory Surgical Treatment Center Licensure Act, (D.C. Law 2–66, 24 D.C. Register 6836, January 19, 1978) prohibits the overnight retention of patients. He continued to keep Ms. Furr at the Clinic on Friday until approximately 9:00 p.m., when he moved her for another overnight stay to the Clinic Annex, which is located at his residence in Silver Spring, Maryland. He returned Ms. Furr to the Clinic on Saturday, January 10, and discharged her.

On Sunday, January 11, Ms. Furr was taken to Hadley Memorial Hospital, in severe pain, by her relatives. The next morning Dr. Joseph Bourke and Dr. William Brownlee, obstetrician-gynecologists, performed exploratory surgery and discovered that a recent, unsutured laceration in the cervix had left a hole leading from the vagina to the abdominal cavity. They found that significant pelvic and intestinal peritonitis (inflammation of the membrane lining the abdominal cavity) had infected the uterus which necessitated a total hysterectomy. Dr. Brownlee and Dr. Bourke performed the hysterectomy and also removed a mass of dead tissue from the abdomen, which laboratory analysis revealed was fetal tissue which had not been removed during the abortion.

Appellee sued Dr. and Mrs. Vuitch and others for their individual actions and their actions as agents, officers and directors, and employees of Laurel Clinic and Laurel Hospital, on multiple theories, including medical malpractice, civil conspiracy in the commission of medical malpractice for profit, and disregard and manipulation of the corporate entities (3rd amended complaint).[3] She also sued the corporations, alleging they were liable for the injurious acts of their employees and agents, and demanded a jury trial on all of the issues. The jury found for appellee on all claims

---

3. Appellee's original complaint included other individuals and employees of the Clinic and other theories of liability. In particular, appellee alleged lack of informed consent against Dr. Vuitch and the Clinic (R. 6), breach of duty against the Clinic (R. 8), and false imprisonment (R. 11). Through the course of pre-trial proceedings these claims were eliminated from the suit by the time of trial.

against all appellants and, in answers to special interrogatories, found that the corporate veils of Laurel Clinic and Laurel Hospital should be pierced and that Mrs. Vuitch had participated in tortious or negligent acts which proximately caused injury to appellee. The jury awarded appellee $125,000 in compensatory damages but denied her request for punitive damages.

## II.

### Piercing the Corporate Veil

Appellants assert that the jury should not have been allowed to pierce the corporate veils of Laurel Clinic, Inc. and Laurel Hospital, Inc. to impose shareholder liability because the evidence was insufficient as a matter of law to permit consideration of the issue.

■ The general rule is that a corporation is regarded as an entity separate and distinct from its shareholders. *Harris v. Wagshal*, 343 A.2d 283, 287 (D.C.1975). Throughout the years this court has held that the acts and obligations of the corporate entity will not be recognized as those of a particular person until the party seeking to disregard the corporate entity has

proved by affirmative evidence that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong. *McAuliffe v. C. & K. Builders*, 142 A.2d 605, 607 (D.C.1958).[4] *In Burrows Motor Co. v. Davis*, 76 A.2d 163, 165 (D.C.1950), the court stated:

> Before a corporate entity can be disregarded and the acts and obligations of a corporation can legally be recognized as those of particular persons, or vice versa, it must appear that the corporation is not only controlled by those persons, but also that the separateness of the persons and the corporation has ceased and the facts must be such that an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice.

■ More recently, the court has held that considerations of justice and equity can justify piercing the corporate veil and has rejected the contention that in order to pierce the corporate veil there must be a showing of fraud "directly tainting the obligation on which the plaintiff is suing...." *Harris v. Wagshal, supra*, 343 A.2d at 287–288.[5] Because piercing the corporate

4. In this jurisdiction, the formula has been variously described. Thus, as explained in *Callas v. Independent Taxi Owners Ass'n.*, 62 App.D.C. 212, 213, 66 F.2d 192, 193 (1933) (quoting *United States v. Milwaukee Refrigerator Transit Co.*, 142 F. 247, 255 (E.D.Wis.1905)):

> If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.

And in *Francis O. Day Co. v. Shapiro*, 105 U.S.App.D.C. 392, 395, 267 F.2d 669, 672 (1959), the court commented:

> it is the *use* to which the corporate form is put which controls and the facts in the particular case will determine the course of relief.... However the corporate form may be utilized as the instrumentality through which the injustice is worked ... the circumstances of each case must justify the application of the rule.

(Emphasis in original).

5. The two elements are variously described and in some jurisdictions a third element—that the control and breach of duty, set forth in the first two elements, have proximately caused the injury or unjust loss complained of—must also be proved. In *Lowendahl v. Baltimore & Ohio R.R. Co.*, 247 App.Div. 144, 160–61, 287 N.Y.S. 62, 76, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936), the court held that not only must there be shown complete domination of the corporate entity and use of such domination to perpetrate fraud or wrong, but "[t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." The court summarized the three elements as follows:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud, or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust

veil is a doctrine of equity,[6] the factor which predominates will vary in each case, and the decision to pierce will be influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of a corporation.[7]

■ There is no precise formula by which to predict when courts will pierce the corporate veil since each case is sui generis. 1 *Fletcher, Cyclopedia of Corporations,* § 41.30 (perm. ed. 1983).[8] Nor is there a uniform standard to determine whether the evidence has sufficiently demonstrated unity of interest and ownership. Many factors are considered, including whether corporate formalities have been disregarded, and whether there has occurred an intermingling of corporate and personal funds, staff, and property. *Valley Finance, Inc. v. United States,* 203 U.S.App.D.C. 128, 138, 629 F.2d 162, 172

(1980) ("The test is a practical one, based largely on a reading of the particular factual circumstances"), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Unity of interest and ownership can also be demonstrated by showing domination and control of a corporation, as in a parent-subsidiary relationship or in a closely held corporation. In *Harris v. Wagshal, supra,* 343 A.2d at 287, this court held piercing the corporate veil was justified because of evidence of: (1) appellants' fraudulent use, as their personal instrument, of a corporation they had formed to protect their business from the claims of Mr. Harris' judgment creditors; (2) extensive commingling of personal and corporate funds; (3) substantial disregard of the formalities of the corporate form and (4) inadequate initial capitalization.[9]

■ Guided by these standards, our review of the record indicates that appellee

act in contravention of plaintiff's legal rights; and
(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
Other jurisdictions do not require proof of the third element. *Compare Lowendahl v. Baltimore & Ohio R.R., supra, and Saphir v. Neustadt,* 177 Conn. 191, 210, 413 A.2d 843, 853 (1979) *with Automotriz Del Golfo de Cal. S.A. v. Resnick,* 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957) (en banc), and *FMC Finance Corp. v. Murphree,* 632 F.2d 413, 421–22 (5th Cir.1980) (Illinois Law), *cited in* Note, *Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law,* 95 Harv.L.Rev. 853, 854 n. 8 (1982).

6. It is an equitable doctrine, but the issue of whether the corporate veil should be pierced is properly submitted to a jury. *McAuliffe v. C & K Builders, Inc., supra,* 142 A.2d at 605; *Callas v. Independent Taxi Owners' Ass'n, supra* note 4, 62 App.D.C. at 214, 66 F.2d at 194.

7. *See generally,* Krendl and Krendl, *Piercing the Corporate Veil: Focusing the Inquiry,* 56 Den.L. Rev. 1, 23 (1978).

8. In the oft-quoted language of Justice Cardozo in *Berkey v. Third Ave. R.R.,* 244 N.Y. 84, 89, 94–95, 155 N.E. 58, 61 (1926):
The whole problem of the relationship between parents and subsidiary corporations is one that is still enveloped in the mist of metaphor. Metaphors in law are to be narrowly

watched, for starting as the devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an "alias" or a "dummy." All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term is to be defined in the act of operation. Dominion may be so complete, interference so obstrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the test of honesty and justice. Ballantine, Parent and Subsidiary Corporations, 14 Cal.Law Rev. 12, 18, 19, 20. The logical consistency of a judicial conception will indeed be sacrificed at times, when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law. [Citation omitted]. At such times, unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form.

9. The fourth factor, noted in a footnote, was apparently not deemed by the court to be as significant as the first three factors. *Harris v. Wagshal, supra,* 343 A.2d at 288 n. 11.

presented sufficient evidence to demonstrate unity of interest and control by the Vuitchs of Laurel Hospital, Inc. and Laurel Clinic, Inc. The record reveals Laurel Clinic is owned by Laurel Hospital, Inc., which is a Maryland corporation in which Dr. and Mrs. Vuitch own all of the stock. Each corporation is run by a three-person Board of Directors; Dr. Vuitch is the president of both corporations, as well as the medical director of the Clinic, and Mrs. Vuitch is secretary-treasurer of both corporations. Their son, William, is the other director of the Clinic. Since the Clinic's founding in 1973, Dr. and Mrs. Vuitch have been annually elected as its officers without holding any meetings (Plaintiff's Exhibit 20A).[10]

The evidence amply demonstrated the Vuitchs' intermingling of the affairs of both corporations for their personal purposes over a period of years. Laurel Hospital was incorporated, obtained a certificate to do business in the District of Columbia, and opened a clinic at 1712 Eye Street, N.W. in 1969. Thereafter, in 1973, the Vuitchs separately incorporated the Eye Street Clinic as Laurel Clinic, Inc. under District of Columbia law, (Plaintiff's Exhibit 20) and Laurel Hospital has existed only on paper since then.[11] The corporate offices for the Hospital and Clinic are, and always have been, Dr. Vuitch's residence at 1225 Edgevale Road, Silver Spring, Maryland, (the Annex), which Dr. and Mrs. Vuitch jointly own.[12] For several years all Clinic bills were paid by Laurel Hospital, and the Clinic's employees were and are covered by the Hospital's Pension and Trust Plan (Plaintiff's Exhibit 20A). Laurel Hospital and Laurel Clinic file a consolidated tax return. Dr. Vuitch uses a Laurel Hospital car to transport patients from the Clinic to the Annex, which he uses to treat Clinic patients overnight. Yet the Annex, which is not licensed in Maryland to treat patients,[13] is both Dr. Vuitch's personal residence and the business office of Laurel Hospital. Mrs. Vuitch pays all bills for the upkeep of the Edgevale Road property from "Dr. Vuitch's accounts."[14] The pattern of intermingling the identities and property of the two corporations and disregarding some corporate formalities is probative evidence that the two corporations did not have separate identities and were in fact the Vuitchs' alter-ego for the operation of medical facilities for personal gain.[15] *See* 1 *Fletcher, supra* § 25 (where several corporations have same officers or shareholders or both, cumulative effect of operation of business can have probative effect on issue of piercing veils of both); *see also Valley Finance, supra,* 203 U.S.App.D.C. at 138, 629 F.2d at 172 (court may ignore existence of corporate form whenever "an individual so dominates his organization 'as in reality to negate its separate personality' ") (quoting *Quinn v. Butz,* 166 U.S.App. D.C. 363, 378, 510 F.2d 743, 758 (1975)).

■ Appellants insist, nevertheless, that appellee has failed to show that any unfairness or injustice was perpetrated by use of the corporate form. We disagree. The Clinic was licensed as an ambulatory surgical treatment center under the D.C. Ambu-

---

10. We do not suggest, however, that the elections were inconsistent with D.C.Code § 29–399.37 (1984 Supp.) which permits Boards of Directors to take actions without meetings if all members of the Board of Directors of a corporation consent in writing.

11. See Appellant's Brief at 11. Laurel Hospital was incorporated for the purpose of building a hospital in Laurel, Maryland. The office at 1712 Eye Street was operated as an outpatient facility for the hospital while Dr. and Mrs. Vuitch waited for the hospital to be built. The hospital was never built.

12. Mrs. Vuitch also lived at the Silver Spring residence until she and Dr. Vuitch separated in 1973.

13. Dr. Vuitch testified that Maryland law does not require the Annex to be licensed, but appellee rebutted his claim, relying on Code of Maryland Regulations, Title 10, Subtitle 07, Chapter 01, "Acute General Hospitals and Special Hospitals" (Plaintiff's Exhibit 27).

14. *See infra* note 37.

15. In fiscal year 1980 Dr. Vuitch received a salary of $191,364 and Mrs. Vuitch received a salary of $39,000.

latory Surgical Treatment Center Licensure Act, 24 D.C.Reg. 6836. The Act excludes from the definition of an "ambulatory treatment center" a facility which provides beds or other accommodations for the overnight stay of patients.[16] It also requires that licensed centers give evidence of the capacity to provide emergency care and of agreement(s) with a hospital within twenty minutes distance of the center to admit patients requiring emergency care.[17] The Act establishes postoperative procedures for such centers and requires, "if good medical practice so indicates," that patients with adverse conditions or compli-

cations shall be transferred to a hospital.[18] Violation of the Act is punishable by a fine of $300 or 90 days' imprisonment.[19] The legislative history indicates that the Act was designed to close a gap in the District's licensing laws, which had not previously covered non-hospital surgery, and to assure that the highest level of skilled care was provided at such clinics. *Report of the Council of the District of Columbia, Committee on Human Resources and Aging,* July 21, 1977, at 5.

■ Dr. Vuitch, as the medical director of the Clinic, is responsible for the medical policies.[20] He testified that it is his policy

---

16. Section 103(a) provides:
 Definitions. For the purposes of this act: (a) "Ambulatory Surgical Treatment Center" means any institution, place or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures on an outpatient basis including facilities where family planning procedures are performed. Such facility shall not provide beds or other accommodations for the overnight stay of patients. Individual patients shall be discharged in an ambulatory condition without danger to the continued well being of the patients or shall be transferred to a hospital.
 The term "Ambulatory Surgical Treatment Center" does not include: (1) any institution or building licensed as a hospital under the Act of April 20, 1908 (35 Stat. 64; D.C.Code, Sec. 32–301); (2) hospitals maintained by the District of Columbia; (3) any place, agency, clinic or practice, public or private, profit or non-profit, devoted exclusively to the performance of dental or oral surgical procedures; (4) any professional office wherein a physician customarily performs surgical procedures for minor diagnosis and treatment of dermatological or podiatric condition or cystoscopies or proctoscopies.

17. Section 202(e)(2) provides:
 Sec. 202. *Application.* Application for license to operate a center shall be made to the Mayor on forms furnished by him and shall include, but not be limited to, the following information.
 (e) evidence of capacity to provide emergency care expeditiously for a patient. Such evidence shall include, at a minimum:
 (2) agreement(s) between the center and a hospital not more than twenty (20) minutes ambulance driving time from the center that the hospital will admit all center patients *needing* emergency care, or proof that all physicians using the center have, or a center

staff physician is always available who has, admitting privileges at a hospital not more than twenty (20) minutes ambulance time from the center.

18. Section 305 provides:
 Post-operative requirements.
 (a) Each center shall establish a program to ensure post-surgical treatment for each individual treated in the center and shall include (but is not limited to) the following written instructions to be issued to all patients:
 (1) symptoms of complications to be looked for;
 (2) activities to be avoided, if any;
 (3) specific telephone number to be used by the patient should any complication occur or question arise;
 (4) reminder to make arrangements with the center or the patient's personal physician for a post-operative check-up.
 (b) Following the surgical procedure, patients shall be observed in the center for a period of time sufficient to ensure that no immediate post-operative complications are present following the administration of anesthetics.
 (c) Patients in whom any adverse condition exists or in whom a complication is known or suspected to have occurred during or after the performance of the surgical procedure shall be transferred and admitted to a hospital, if good medical practice so indicates.

19. Section 503 provides: Penalty. Any person violating any provision of these guidelines shall be fined not more than three hundred dollars ($300), or imprisoned for not more than ninety (90) days.

20. Section 302 of the D.C. Ambulatory Surgical Treatment Center Licensure Act provides that responsibility for patient care in each center licensed under the Act is in the medical di-

to treat surgical complications in the Clinic and to keep patients overnight at the Annex because the District's licensing law does not permit him to keep patients overnight at the Clinic.[21] Dr. Vuitch thus revealed a knowing and intentional violation of the District of Columbia law pursuant to corporate policy, and the record indicates he used corporate property to carry out his policy.[22] Courts will not allow the interposition of a corporation to defeat a legislative policy. *Anderson v. Abbott,* 321 U.S. 349, 362–63, 64 S.Ct. 531, 537–38, 88 L.Ed. 793 (1944). Appellee also presented sufficient expert medical evidence that, contrary to Dr. Vuitch's contention, "good medical practice" required that appellee be promptly transferred to a hospital in view of her medical complications.[23]

As part of their contention that appellee has not shown that unfairness or injustice was perpetrated, appellants also argue appellee has not shown that either corporation is unable to pay the amount of the judgment rendered in her favor. While we agree that insolvency or undercapitalization is often an important factor evidenc-

ing injustice, *McAuliffe v. C. & K. Builders, supra,* 142 A.2d at 607, it is by no means the only method by which appellee can demonstrate use of the corporate form to promote injustice or wrong.[24] *Harris v. Wagshal, supra,* 343 A.2d at 287, *Francis O. Day Co. v. Shapiro, supra* note 4, 105 U.S.App.D.C. at 397, 267 F.2d at 674. The general exhaustion rule is based on the concern that stockholders of the parent corporation could be joined at the outset of every case against a subsidiary and "forced to undergo elaborate pretrial proceedings as well as trial itself on issues only relevant if a judgment was recovered and execution was returned unsatisfied." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 266 F.Supp. 79, 83 (S.D.N.Y.1967).[25] This concern is not present in the instant case, however, because the corporations are closely held and the corporate officers and directors of each corporation are also the only shareholders. Thus, we find no reason to force appellee to expend further time, effort, and expense in attorney's fees and court time; appellants can remedy any inequities between themselves when they determine how the judgment shall be

---

rector; Section 303 requires each center to have a medical director. Laurel Clinic's Bylaws, Article X, Section 10.03 provided "the medical director shall be responsible for the establishment of policies relating to the medical affairs."

**21.** Dr. Vuitch testified "We handle complications which arise during the surgery and which I feel, and my staff and my clinic [are] equipped to handle, and those are mostly surgical complications. If we have some other kind of complication, we send them to hospital, medical complications." He testified that approximately four times a year as many as three patients stayed overnight at the Annex. He also testified that since 1963 he has not had staff privileges at any hospital.

Article X, Section 10.5 of the bylaws of the Clinic provide that "No patient shall be discharged after surgery until the medical director has determined that the patient is in a normal post-operative state and the patient has been given advice as to post-operative care."

**22.** Dr. Vuitch had testified before the Council of the District of Columbia during its consideration of the D.C. Ambulatory Surgical Treatment Center Licensure legislation.

**23.** See Part IV of this opinion.

**24.** The 1972 articles of incorporation for Laurel Clinic provided for 5000 shares at par value of one dollar per share. Clinic business was not to commence until at least $1,000 had been received from the issuance of shares. (Appellee's Exhibit 20).

**25.** Unlike the New York cases on which appellant relies, the District of Columbia does not have a statute or rule requiring that a plaintiff exhaust his other remedies by returning a wholly or partially unsatisfied judgment against a subsidiary before suing the parent. *Eskimo Pie Corp. v. Whitelawn Dairies, Inc., supra,* 266 F.Supp. at 82 (citing as exception to general exhaustion rule *Mull v. Colt Co.,* 31 F.R.D. 154 (S.D.N.Y.1962) piercing allowed in personal injury suit where corporate machinations, by multiple shell incorporations (each of one hundred corporations owned only two taxicabs) were designed to exploit minimum statutory insurance requirements for taxicabs, held to pervert legislative intent: "The sanctity of a separate corporate identity is upheld only insofar as the entity is consonant with the underlying policies which give it life").

paid.[26] See *Black & White, Inc. v. Love,* 236 Ark. 529, 367 S.W.2d 427 (1963). Moreover, we are persuaded that because the privilege of transacting business in a corporate form granted by the legislature has been used contrary to law, and because the separate incorporation of the Clinic appears to be consistent only with establishing a double layer of insulation for Laurel Hospital and Dr. and Mrs. Vuitch, the total organization should not be allowed to be artificially subdivided for the sole purpose of limiting liability. *See Black & White, Inc. v. Love, supra,* 236 Ark. 529, 367 S.W.2d 427 (piercing allowed where two corporations owned by same stockholders, operated by same officers, and corporate property used interchangeably) (citing *Callas v. Independent Taxi Owners, supra* ).[27]

 Finally appellants have urged us to reverse the jury's piercing the corporate veils on the ground that appellee has not demonstrated a proximate causal connection between the acts of appellants and her injury. While some jurisdictions require this as a third element in piercing cases, see *supra* note 5, we do not read the cases in this jurisdiction to require such a rigid proximate cause formulation. *See Harris v. Wagshal, supra,* 343 A.2d at 287–88; *McAuliffe v. C & K Builders, supra.*[28] Accordingly, on review of the denial of a directed verdict we hold that there was sufficient evidence of: (1) unity of ownership and interest between the Vuitchs and the Clinic and the Hospital, and (2) use of

the corporate form, through operation of the Clinic, to perpetrate a wrong, for the trial court to submit the issue of piercing the corporate veils of Laurel Clinic and Laurel Hospital to the jury, and for the jury's decision to pierce the veils of both corporations.

### III.

### *Liability of Corporate Officer*

 Appellants also challenge the denial of a directed verdict on the jury's determination that Mrs. Vuitch was individually liable for appellee's injuries. The trial court instructed the jury that appellee had presented three theories of liability with respect to Mrs. Vuitch: (1) vicarious liability as a shareholder of the corporations whose corporate veils should be pierced; (2) civil conspiracy; and (3) negligence, in that she was liable for her own tortious acts as a corporate officer.[29] The trial court also instructed the jury, after setting forth appellee's various theories of liability, that if it found for appellee on any theory as to any appellant, it need not consider the remaining theories. We have addressed appellee's first theory of Mrs. Vuitch's liability in Part II of this opinion, and because of our holding that the evidence was sufficient to pierce the corporate veil of both corporations, we need not and do not decide whether Mrs. Vuitch could be held individually liable as a participant in a

26. The By-Laws of the Clinic provide for indemnification of officers and directors acting on behalf of the corporation. (Article III, Section 3.14, Appellee's Exhibit 20).

27. *See also Shirley v. The Drackett Prod. Co.,* 26 Mich.App. 644, 182 N.W.2d 726 (1970) (defendant corporation existed solely as distributing arm of manufacturer, and manufacturer's sole source of revenue was from subsidiary's sale of manufacturer's products, the separate existence of the subsidiary was ignored).

28. We note that cases like *Lowendahl, supra* note 5, which require proximate cause, involve attempts to recover for allegedly fraudulent economic transactions. Even were we to adopt the third *Lowendahl* requirement, we are satisfied that appellee's medical evidence amply demon-

strated that appellants' manipulation of corporate enterprises proximately caused her injuries. See Part IV of this opinion.

29. In her brief, appellee also argues that Mrs. Vuitch is liable as an aider-abetter for rendering substantial assistance or encouragement to Dr. Vuitch's tortious conduct. Because we find the evidence was sufficient to support the verdict against Mrs. Vuitch on other theories and it appears the jury was not instructed on the aider-abettor theory, we do not consider it. *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 126 (D.C.1976) (issue not raised below will not be considered on appeal), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977).

civil conspiracy.[30] We now examine the third theory, that Mrs. Vuitch committed tortious acts which injured appellee.

■■■ The general rule is that corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation. *Cafritz v. Corp. Audit Co.*, 60 F.Supp. 627 (D.D.C. 1945). In *Bethesda Salvage Co. v. Fireman's Fund Ins. Co.*, 111 A.2d 472, 474 (D.C.1955), this court noted:

> Corporate officers are liable for their torts, although committed when acting officially. In other words, corporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval. [quoting 3A *Fletcher, supra*, § 1135 (1969)].

Sufficient participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense. *Dwyer v. Lanan & Snow Lumber Co.*, 141 Cal.App.2d 838, 297 P.2d 490 (1956) (in closely held corporation, judgment against corporate acting president for failure to remove steel cable from roadway affirmed, where two of three persons running corporation, including president, knew of the danger but failed to remedy situation).

Appellants contend that because the evidence was insufficient to connect Mrs. Vuitch to any medical practices of Laurel Clinic, no reasonable juror could have concluded that she participated in any negligent or tortious act causing injury to appellee. Mrs. Vuitch claimed that since she had no training in medicine, did not determine or participate in the development of the medical policy for Laurel Clinic, and had no knowledge that appellee was treated at the Clinic, she had not committed any negligent or tortious acts which resulted in appellee's injury. Appellee's theory of Mrs. Vuitch's liability for her own tortious acts centered on the commission by her (as well as by Dr. Vuitch) of an intentional tort as a result of appellee's retention in the Clinic and the Annex for post-operative treatment in violation of sections 103(a)[31] and 305(c)[32] of the D.C. Ambulatory Surgical Treatment Center Licensure Act.

Laurel Clinic's Articles of Incorporation provide for three directors. As noted, the three-person Board of Directors consists of Dr. and Mrs. Vuitch and their son, and since 1973, Dr. and Mrs. Vuitch have been co-owners of all corporate stock and of the Edgevale property used by the Clinic Annex. The Clinic's By-Laws provide that

> All corporate powers of the corporation shall be exercised by or under the authority of and the business and affairs of the corporation shall be controlled by the Board of Directors subject, however, to such limitations as are imposed by law, the Articles of Incorporation or these by-laws, as to actions to be authorized or approved by the shareholders. The Board of Directors may by contract or

---

**30.** A cause of action for civil conspiracy as a basis of establishing vicarious liability for tortious conduct is recognized in the District of Columbia. *International Underwriters, Inc. v. Boyle*, 365 A.2d 779, 784 (D.C.1976); *see Halberstam v. Welch*, 227 U.S.App.D.C. 167, 705 F.2d 472, 479 (1983) (construing District of Columbia law). But this court has not decided whether officers of the same corporation can conspire with each other, or with their own corporations. Submission of the issue of civil conspiracy to the jury was, if error, harmless since the evidence presented on that issue was also relevant to other theories of liability properly before the jury. *Cf. Washington Hospital Center v. Martin*, 454 A.2d 306, 310 (D.C.1982) (Defendant-appellant not prejudiced by giving of *res ipsa loquitur* instruction because jury could find negligence without it).

**31.** *See supra* note 16.

**32.** *See supra* note 18.

otherwise give general or limited special powers and authority to the officers and employees of the corporation to transact general business or any special business of the corporation, and may give powers of attorney to the agents of the Corporation to transact any special business requiring such authorization.

Article III, Section 3.01. (Plaintiff's Exhibit No. 20).

Mrs. Vuitch has been the Clinic's secretary-treasurer since 1973 and her duties are chiefly in the areas of business and finance.[33] She is trained in banking, accounting, business and nursing home administration. She handles the finances for the Clinic, which Dr. Vuitch described as a "huge clinic," [34] and the Hospital, and pays all the bills, takes care of matters such as the lease negotiations for the Eye Street Office and generally works with the attorneys on the corporations' affairs. As a corporate officer and director she, with the other directors, is responsible for approval of the by-laws as well as the appointments of the Clinic medical director and administrator, and has the power to purchase and maintain insurance for the corporation and others, and to secure other indemnification.[35]

In addition to being the second-ranking officer in a substantial operation, Mrs. Vuitch had also been aware of the Clinic's long-standing overnight policy for treating patients. On direct examination, Mrs. Vuitch asserted that she was unaware patients had stayed overnight at the Clinic after 1973 and did not know patients had stayed at the Annex for surgical or medical treatment; she also testified that she learned appellee had been treated at the Clinic after appellee had left on Friday. She admitted, however, that she knew Clinic patients went to the Annex and remained overnight, although she believed they went for their own convenience and not because of medical complications. But in her deposition testimony, which was read into evidence at trial, Mrs. Vuitch admitted that she understood it has been Dr. Vuitch's policy to treat complications in the Clinic and not to transfer patients to a hospital.[36] Moreover, Mrs. Vuitch testified that she was never told by anyone that the policy of keeping patients overnight at the Clinic and Annex had changed. She considered her job to be full time, had an office at the Clinic and also admitted that in addition to paying all the bills [37] for the Edgevale property on which the Annex is located, she visits the property to corroborate which bills should be paid.

Mrs. Vuitch also evidenced knowledge of the D.C. Ambulatory Surgical Treatment Center Licensure Act. She not only knew that the licensing law had changed in 1978, but her deposition refreshed her recollection that she had spoken to a company representative about its requirements. Although she asserted at trial that she had no memory of meeting with lawyers to discuss the requirements under the Act after it was passed in 1978, she admitted that part of her job included dealing with lawyers about legal matters. Dr. Vuitch testified that Mrs. Vuitch knew he had testified at hearings before the Council of the District

33. She is also president of Pregnancy Counseling Services, Inc., a subsidiary corporation which is wholly owned by the Clinic and located at the Clinic office in the District of Columbia.

34. Dr. Vuitch testified the Clinic had performed approximately 50,000 abortions, occupies 3000 square feet and includes counseling and contraceptive services as well as a surgical staff of eight physicians.

35. Laurel Clinic, Inc. Bylaws, Article X, § 10.2; Resolution of June 2, 1979; Article X, § 10.5 (see supra note 21); Article III, § 3.16. Plaintiff's Exhibit 20.

36. Dr. Vuitch testified Mrs. Vuitch knew from the outset that the Annex was used for overnight care of surgical patients.

37. Although Mrs. Vuitch referred to paying the bills from "Dr. Vuitch's accounts," the Clinic had an agreement with the American National Bank of Maryland to establish a corporate account for the Clinic, which authorized Dr. Vuitch or Mrs. Vuitch to sign, on behalf of the corporation, checks or other instruments for the payment or withdrawal of funds in the account. Plaintiff's Exhibit 20A.

of Columbia on the proposed ambulatory surgical treatment center licensure legislation, and she had met with legal counsel, Mr. Lucas, after the law was enacted and assisted in obtaining the equipment necessary to comply with the 1978 law.

Contrary to appellants' contention, the evidence supports the jury's verdict that Mrs. Vuitch participated in "some meaningful sense" in the tortious behavior. She remained a corporate officer and exercised her authority as such even though she knew about the corporation's practice of treating surgical complications and retaining patients overnight. She was present at the Clinic at least three days a week, made appointments for patients, participated in counseling services for Clinic patients, had lived at the Annex in the past, and had driven there with Dr. Vuitch when he had transported patients. On cross-examination, her recollection was refreshed that she had even participated in patient care in the past by staying late with patients and, at least once, bringing medicine to patients. She knew what was required and prohibited by law and, nevertheless, facilitated the operations of the Clinic and its Annex, which permitted the corporations' policies and practices to be carried out. Her responsibilities and activities were probative of her knowing participation in the activities of the Clinic.[38]

Appellants' contention that Mrs. Vuitch cannot be held liable for her failure to object, change, or second guess the Clinic's medical practices because she lacked the necessary medical expertise to do so, misses the point. That she does not determine medical policy is not dispositive. As a corporate officer she was charged with responsibility for the management and con-trol of the corporate enterprise in a lawful manner.[39] Her liability does not arise, as appellants suggest, "merely because of her official relation to the corporation," (Brief at 9), but because of activities for which the evidence demonstrated she was responsible and for which she admitted responsibility at trial.

The trial court correctly denied a directed verdict on the issue of Mrs. Vuitch's liability for her own acts. Viewing the evidence most favorably to appellee, the jury could reasonably have found that Mrs. Vuitch's management and control of the business end of the corporate activities facilitated the continuing implementation of the overnight policy which she knew was a regular part of the operations of the Clinic and the Annex, and that she thus authorized and directed the wrongful acts done in the regular course of business. The evidence was sufficient to establish that she knew of and consented to or acquiesced in a long-standing corporate policy which was contrary to the law.[40] *Bethesda Salvage Co. v. Fireman's Fund Ins. Co., supra,* 111 A.2d at 474 (corporate president who owned one-half of all stock and engineered all dealings with insurance policy on false fire loss claim, was personally and individually liable although fraud was committed in behalf of corporation) (citing 3A *Fletcher, supra,* § 1135); *see New England Box v. Gilbert,* 100 N.H. 257, 123 A.2d 833 (1956) (officer or director personally liable for conversion by corporation or one of its officers where knowingly acquiesced therein); *Dwyer v. Lanan & Snow Lumber Co., supra,* 141 Cal.App.2d 838, 297 P.2d 490 (acting president of small corporation held personally liable for injuries to plaintiff who was pinned in truck by fallen cable; president

---

38. Appellants' reliance on *Teledyne Industries, Inc. v. Eon Corp.,* 401 F.Supp. 729, 739 (S.D.N.Y. 1975), *aff'd,* 546 F.2d 495 (2d Cir.1976) (per curiam) is misplaced. That case involved a fraud suit against four directors and officers of a bankrupt corporation, in which the court noted, when discussing the liability of those other than the vice president, who was the prime mover, that there was "really no evidence beyond mere conjecture that they knew or participated in the fraud."

39. *See Thomas Circle Ltd. Partnership v. United States,* 372 A.2d 555 (D.C.1977) (affirming order of abatement against owners who claimed they were unaware of bawdy house activities).

40. Appellants concede that Section 103(a) of the D.C. Ambulatory Surgical Treatment Center Licensure Act "is violated whenever a patient is kept overnight, whatever the reason" (Reply Brief at 9).

knew before cable fell its location was dangerous, but took no action). Moreover, the jury could find on the evidence before it that Mrs. Vuitch's conduct was intentional, and that the violation of the statute was evidence of negligence. *District of Columbia v. White,* 442 A.2d 159, 163 (D.C. 1982); *Whetzel v. Jess Fisher Management Co.,* 108 U.S.App.D.C. 385, 388, 282 F.2d 943, 946 (1960); *Hecht Co. v. McLaughlin,* 93 U.S.App.D.C. 382, 383, 386, 214 F.2d 212, 215 (1954). Such a determination is consistent with the evidence that Dr. and Mrs. Vuitch jointly ran the Clinic although in other respects they led separate lives, and that the manner in which they operated the Clinic, contrary to District of Columbia law, was a proximate cause of appellee's injury.[41] Accordingly, we hold, on review of the denial of a directed verdict, that the evidence was sufficient to submit the issue of Mrs. Vuitch's liability to the jury, and to sustain its verdict.

## IV.

### *Medical Malpractice*

Appellants also contend the trial court erred in denying a directed verdict on the issue of medical malpractice by Dr. Vuitch in performing the second trimester abortion on appellee. They argue there was insufficient evidence to link the actions by Dr. Vuitch or any appellant to the infection requiring appellee's hysterectomy, relying on *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366 (D.C.1980). Through Dr. Vuitch's testimony and expert medical testimony, appellants presented evidence that Dr. Vuitch could not have foreseen what occurred eighteen hours after appellee left his care, and that the actions of Dr. Bourke and Dr. Brownlee were intervening causes which broke the chain of causation.

 Appellee's theory of causation was that Dr. Vuitch's failure to suture the uterine laceration and remove all fetal tissue, and his overnight retention of appellee in the Clinic and the Annex, caused appellee to develop peritonitis which infected the uterus and necessitated the total hysterec-

tomy. Appellee's expert witnesses, Dr. Brownlee, Dr. Bourke, and Dr. Burnhill (an obstetrician-gynecologist at Rutgers Medical School in New Jersey), substantially agreed to a reasonable medical certainty. The jury could reasonably have found, based on their testimony, that Dr. Vuitch negligently failed to suture the uterine laceration and that the open laceration, left untreated for nearly three days while Dr. Vuitch kept appellee in the Clinic and Annex, combined with his failure to remove all fetal tissue, caused the peritonitis requiring the performance of the hysterectomy. *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 282–83, 464 F.2d 772, 791–92, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

The controverted facts and expert opinions and the issues involving the credibility of witnesses were properly submitted to the jury *Corley v. B.P. Oil Corp., supra,* 402 A.2d at 1263. Our review of the record reveals that appellants' challenges to the sufficiency of the evidence on the standard of care, the breach thereof, and proximate cause are without merit. *Morrison v. Mac-Namara,* 407 A.2d 555, 560 (D.C.1979); *Kosberg v. Washington Hospital Center, Inc.,* 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968). Appellants' reliance on *Sponaugle v. Pre-Term, Inc., supra,* 411 A.2d at 366, is misplaced, since the court did not hold that "expert testimony to a reasonable medical certainty is required concerning '*the* proximate cause' and nothing less" (Appellants' Brief at 24). The record before us indicates that appellee's expert testimony did not "skirt the line between contributing cause and speculation." *Id.* at 369 n. 6. We find no error by the trial court in denying the motion for a directed verdict.

Accordingly, the judgment below is

*Affirmed.*

---

**41.** See Part IV of this opinion.