Rachel GONZALEZ, Appellant

v.

INTERNACIONAL DE ELEVADORES,
S.A., Appellee.

No. 03–CV–551.

District of Columbia Court of Appeals.

Argued Sept. 9, 2004.

Decided Jan. 31, 2006.

J. Michael Hannon, with whom James F. Bromley and Matthew W. Carlson were on the brief, Washington, for appellant.

Edward J. Longosz, II, with whom Laura G. Stover was on the brief, Washington, for appellee.

Before WASHINGTON, Chief Judge,[*] and TERRY and REID, Associate Judges.

TERRY, Associate Judge:

Appellant filed this action in the Superior Court against Internacional de Elevadores, S.A. ("IDESA"), a Mexican corporation. The trial court dismissed her complaint for lack of personal jurisdiction. We affirm.

The complaint alleged that on June 11, 1997, appellant Rachel Gonzalez, an employee of the United States government stationed at the American Embassy in Mexico City, was injured when an elevator in which she was riding malfunctioned. IDESA held a contract to renovate and maintain the elevators at the Embassy, including the one in which Mrs. Gonzalez was riding. The maintenance contract was signed in September of 1996. Mrs. Gonzalez and her husband, Richard Gonzalez, filed this suit against IDESA on February 8, 2000, alleging negligence in the maintenance of the elevator. The complaint also named Amtech Elevator Services, Inc. ("Amtech"), an American company, as a defendant.[1]

IDESA filed a motion to dismiss the complaint for lack of personal jurisdiction, which the plaintiffs opposed. Several months later, after additional briefing and extensive jurisdictional discovery, IDESA filed a "Motion to Sever Pre- and Post–1996 Claims and to Dismiss Post–1996 IDESA [sic] for Lack of Personal Jurisdiction." ABM and Amtech also moved for summary judgment. The plaintiffs opposed both motions. In a Memorandum and Order filed on September 26, 2002, the court denied ABM's and Amtech's motion for summary judgment, and dismissed the post–1996 claims against IDESA for lack of personal jurisdiction.[2] The plaintiffs then filed a motion for reconsideration, but that motion was also denied. Richard Gonzalez's claims were settled in their entirety thereafter, and he is no longer a party to this litigation.[3] Rachel Gonzalez filed a timely notice of appeal.

I

Appellant Rachel Gonzalez, a United States citizen, was a receptionist to the

[*] Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

1. Amtech and its parent company, ABM Industries, Inc. ("ABM"), owned IDESA until June 10, 1996, when ABM sold its interest in IDESA to ABF Investment Group ("ABF") pursuant to a Stock Purchase Agreement. The original complaint was amended on September 7, 2001, to include ABM as a defendant.

2. This appeal is therefore concerned only with IDESA's status after the 1996 Stock Purchase Agreement.

3. Rachel Gonzalez also dismissed by stipulation all of her claims against ABM and Amtech, and all of her pre–1996 claims against IDESA. Thus ABM and Amtech are not parties to this appeal.

Ambassador at the American Embassy in Mexico City. IDESA contracted with the Embassy in September of 1996 to maintain and repair the Embassy's elevators. On June 11, 1997, just after appellant entered Elevator No. 1 in the Embassy building, the elevator fell three floors and then came to a sudden stop between two floors. Although the doors of the elevator were jammed shut, appellant was able to open them and crawl to safety. She sustained numerous injuries as a result of the accident, requiring extensive medical treatment.

IDESA is a Mexican company, created and registered under the laws of Mexico and domiciled in Tijuana, Baja California, Mexico, where it has been doing business since 1982. IDESA does not advertise or solicit business in the District of Columbia. It is not a resident of the District of Columbia, nor does it have a registered agent here. From 1990 until June of 1996, IDESA was a wholly-owned subsidiary of ABM, an American corporation.[4] Amtech, ABM's elevator subsidiary, owned one share of fixed capital in IDESA.

On June 10, 1996, ABM/Amtech entered into a Stock Purchase Agreement for the sale of IDESA to ABF Investment Group. The negotiation was overseen by a Los Angeles marketing firm. Pursuant to that agreement, IDESA was sold to ABF for approximately $6 million. Payment was made by means of two promissory notes, which were negotiated at a market interest rate and secured by IDESA's assets and stock. The assets were held in a Mexican trust. The terms of the sale included a ten-year licensing agreement by which IDESA would continue to use Amtech's name and logo in Mexico. The contract also included a "requirements agreement" stating that ABM/Amtech was required to purchase IDESA-manufactured equipment.[5] ABM/Amtech did not retain any ownership interest or control over IDESA; it did, however, require a monthly report on IDESA's financial status. After the sale was completed, IDESA and ABM/Amtech did not share employees, managers, officers, office equipment, or office space. IDESA held corporate meetings as required by law and paid its own taxes.

In September 1996 the American Embassy in Mexico City awarded IDESA a contract for elevator reconstruction and repair at the Embassy. The Embassy solicited the contract in August of 1996, after the sale of IDESA to ABF. The contract was negotiated in Mexico, and all duties under the contract were to be performed in Mexico. The contract also provided that IDESA was subject to the jurisdiction of the federal courts and agencies in the District of Columbia for resolution of any disputes arising under the contract.[6] IDESA subcontracted the maintenance of the elevators to another Mexican company, Cia EHFA. The Embassy sent payments directly to EHFA for its work. No employee or agent of IDESA communicated with any person or persons in the District of Columbia concerning the contract, and no IDESA employee or agent ever traveled to the District of Columbia in connection with the contract. The contract did contain an error stating that IDESA was "incorporated under the laws of the state

---

4. Appellant claims that "Amtech created IDESA to operate as a corporate shell to enable it as an American company to conduct business in Mexico." As we shall discuss more fully in part III-A of this opinion, the record does not support this claim.

5. Amtech apparently did not comply with the requirements agreement, but that fact has no bearing on this case.

6. The present dispute, however, cannot be said to arise under the 1996 maintenance contract, since it is a tort claim rather than a breach of contract claim.

of California, USA." This error, however, was noted and corrected in a letter dated February 10, 1998, from IDESA's General Director, Isauro Barrutia, to the contracting officer at the Embassy.[7]

IDESA's only contacts with the District of Columbia were established in the deposition of James J. Freeman, a vice president of Amtech who worked at Amtech's office in Capitol Heights, Maryland, a suburb of Washington. Mr. Freeman testified that his office ordered components from IDESA for a project at the Department of Labor seven to ten years prior to the date of his deposition (May 24, 2002) and for an FBI project approximately ten years before that. The last time his office ordered anything from IDESA, Mr. Freeman said, was five to ten years before the date of his deposition. He also testified that he was unaware of any IDESA elevator components currently being supplied to Amtech.

Appellant argued below that the court had personal jurisdiction over IDESA for the post–1996 claims on the theories of alter ego, apparent authority, concurrent jurisdiction based on contract, and "doing business."[8] Appellant also argued for concurrent personal jurisdiction on the basis of IDESA's contract with the Embassy.

The court found no support for these arguments and dismissed the case against IDESA for lack of personal jurisdiction.

## II

 "A court may assert personal jurisdiction over a nonresident defendant where service of process is authorized by statute and where the service of process so authorized is consistent with due process." *Mouzavires v. Baxter*, 434 A.2d 988, 990 (D.C.1981). Personal jurisdiction over foreign corporations is authorized by statute in the District of Columbia in two ways. Under the District's long-arm statute, a foreign corporation, acting directly or through an agent, is subject to personal jurisdiction in the District if, among other things, it has "transact[ed] any business" here. D.C.Code § 13–423(a)(1) (2001). When jurisdiction is based on this section, the claim for relief must "arise[] from" the acts conferring jurisdiction over the defendant. D.C.Code § 13–423(b). This is sometimes referred to as specific jurisdiction. In the alternative, D.C.Code § 13–334(a) may confer general jurisdiction over corporations "doing business" in the District of Columbia.[9]

---

7. There is nothing in the record to suggest that this was anything more than a typographical or clerical error. Appellant asserts that this alleged "misrepresentation" by IDESA caused the Embassy to believe that IDESA "was, in effect, Amtech," and that it never knew Amtech had been sold. We think this assertion is unwarranted, particularly when it was the Embassy that first questioned the "California, USA" reference in the contract. In any event, even if IDESA had been a California corporation, amenable to suit in California, it does not follow that it would have been subject to the personal jurisdiction of the courts *of the District of Columbia*. See also part IV–B of this opinion.

8. This apparently refers to long-arm jurisdiction, although, as we shall see in a moment,

long-arm analysis more properly focuses on "transacting business." Inquiries regarding general jurisdiction apply a "doing business" analysis, but, as we shall also explain, this concept is inapplicable in the instant case.

9. Appellant argues in her brief that the trial court had general jurisdiction over IDESA under D.C.Code § 13–334(a). The court's Memorandum and Order of September 26, 2002, analyzed the issues under section 13–423(a)(1), the long-arm statute, but did not mention general jurisdiction. Consequently, it is unclear which provision appellant is relying upon in asserting personal jurisdiction. In any event, neither section 13–334(a) nor section 13–423(a)(1) of the Code ultimately confers personal jurisdiction over IDESA.

### A. General Jurisdiction under D.C.Code § 13–334: "Doing Business"

On its face, D.C.Code § 13–334(a) appears to relate only to service of process on foreign corporations. This court, however, has long used section 13–334(a) as a means of "conferr[ing] jurisdiction upon trial courts here over foreign corporations doing substantial business in the District of Columbia . . . ." *Guevara v. Reed,* 598 A.2d 1157, 1159 (D.C.1991). Section 13–334(a) provides:

> In an action against a foreign corporation *doing business* in the District, process may be served on the agent of the corporation or person conducting its business, or, when he is absent and can not be found, by leaving a copy at the principal place of business in the District, or, where there is no such place of business, by leaving a copy at the place of business or residence of the agent in the District, and that service is effectual to bring the corporation before the court. [Emphasis added.]

In *AMAF International Corp. v. Ralston Purina Co.,* 428 A.2d 849 (D.C.1981), we held that "a foreign corporation which carries on a consistent pattern of regular business activity within the jurisdiction is subject to the general jurisdiction of our courts, upon proper service, and not merely for suits arising out of its activity in the District of Columbia." *Id.* at 850. The proper inquiry is whether there is "any continuing corporate presence in the forum state directed at advancing the corporation's objectives." *Id.* at 851 (citations omitted). If this test is met, the trial court may exercise jurisdiction, provided that such an exercise comports with due process. *Everett v. Nissan Motor Corp.,* 628 A.2d 106, 108 (D.C.1993). In other words,

the defendant corporation must purposely avail itself of the privilege of conducting activities within the forum state, and its continuing contacts with the District of Columbia must provide it with clear notice that it is subject to suit here. *AMAF,* 428 A.2d at 851–852; *see also Trerotola v. Cotter,* 601 A.2d 60, 64 (D.C.1991); *Ross v. Product Development Corp.,* 736 F.Supp. 285, 290 (D.D.C.1989).

Appellant relies on D.C.Code § 13–334(a) as a basis for her claim that the trial court had general jurisdiction over IDESA. As a preliminary matter, we must determine whether the defendant was properly served under § 13–334(a), *i.e.,* whether IDESA was personally served in the District of Columbia. In this case, that did not happen; by her own admission, appellant served IDESA in Mexico.[10] As a consequence, appellant has "failed to comply with the statute's mandate, and [is] thus foreclosed from benefiting from its jurisdictional protection." *Everett,* 628 A.2d at 108 (holding that, by serving defendant in California, appellant did not comply with section 13–334(a)). We therefore have no occasion to consider or decide whether IDESA is "doing business" in the District of Columbia for purposes of personal jurisdiction under section 13–334(a).

### B. Specific Jurisdiction under D.C.Code § 13–423: "Transacting Business"

Section 13–423 of the Code, the District of Columbia's long-arm statute, provides another means of obtaining personal jurisdiction over non-resident defendants. That statute provides in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as

---

10. That was the only place where IDESA could have been served, since the company has no offices and maintains no registered agent in the District of Columbia or anywhere else in the United States.

to a claim for relief arising from the person's—

(1) *transacting any business* in the District of Columbia[.]

\* \* \* \* \* \*

(b) When jurisdiction over a person is based solely on this section, only a claim for relief arising from acts enumerated in this section may be asserted against him. [Emphasis added.]

Although appellant did not specifically make an argument for personal jurisdiction based on the long-arm statute, her arguments with regard to IDESA's contacts with the District can be fairly understood to include a long-arm assertion.

■■■ We conducted an extensive analysis of the history of section 13–423(a)(1) and (b) in *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 324–330 (D.C.2000) (en banc), which we need not reiterate here. It is sufficient to note that this court has interpreted the "transacting any business" provision to be coextensive with the Due Process Clause of the Fifth Amendment. *Id.* at 325–326 (citing *Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808, 810–811 (D.C.1976) (en banc)). In other words, the defendant must have minimum contacts with the forum so that exercising personal jurisdiction over it would not offend "traditional notions of fair play and substantial justice." *Shoppers,* 746 A.2d at 330 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Hence the defendant must have " 'purposefully directed' [its] activities at residents of the forum . . . ." *Shoppers,* 746 A.2d at 331 (citations omitted). This means that the non-resident defendant's "conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286,

297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see Shoppers,* 746 A.2d at 329. Furthermore, under section 13–423(b), there must be a "discernible relationship" between the claims raised and the business transacted in the District. *Id.* The claims must therefore "relate to" or have a "substantial connection with" the acts forming the basis for jurisdiction. *Id.* at 335.

Applying these principles to the facts in the instant case, we conclude that there is no basis for exercising personal jurisdiction over IDESA under the long-arm statute.

### 1. *Minimum Contacts*

Appellant maintains that IDESA had sufficient contact with the District of Columbia so that it would be reasonably foreseeable that IDESA would be haled into court here. As evidence of IDESA's business transactions in the District, appellant cites the deposition testimony of James Freeman that Amtech used IDESA's equipment in several building projects in the District, and that Amtech's inventory included elevator parts supplied by IDESA, which were then used to service its elevator maintenance contracts, including those in the District of Columbia. This court has held that the trial court may properly exercise personal jurisdiction over a non-resident defendant when the defendant has directly shipped goods into the District and sold them to District retailers. *Cohane v. Arpeja–California, Inc.,* 385 A.2d 153, 159 (D.C.1978). But that holding does not help appellant in this case. Appellant asserts that "Mr. Freeman's testimony did not foreclose the otherwise natural circumstance that if . . . Amtech purchased IDESA equipment for its inventory, that inventory would be used for any or all of Amtech's maintenance contracts in the District." But this assertion falls far short of establishing the type

of direct shipping activity on which we based our decision in *Cohane.*

■ Unsubstantiated assumptions about where a product may or may not have been used cannot be the basis for exercising personal jurisdiction over a non-resident corporation. In the *Everett* case, for example, the plaintiff argued that the trial court had personal jurisdiction over the defendant, Nissan, because it was "engaged in the business of distributing automobiles in a region that included the District of Columbia with the expectation that the car would be sold to someone in the same region . . . ." *Everett,* 628 A.2d at 107 (internal quotation marks omitted). This court disagreed, holding that "Nissan's distribution of automobiles in a 'region' that includes the District of Columbia is not sufficient to demonstrate jurisdiction over Nissan . . . in the District of Columbia itself." *Id.* The connection here between IDESA and the District is even more tenuous. IDESA, unlike Nissan, does not distribute parts to "a region that includes the District of Columbia." Rather, it did, at some time in the past, supply Amtech with parts that may or may not have been used in the District. That does not constitute an affirmative act establishing minimum contacts with the District sufficient to enable appellant to bring suit here. On the contrary, IDESA's contacts with the District of Columbia were merely "random, isolated [and] fortuitous." *Shoppers Food Warehouse,* 746 A.2d at 327. Thus we cannot conclude that IDESA transacted business in the District within the meaning of the long-arm statute.

■ Even if appellant could prove that IDESA transacted business in the District of Columbia, IDESA could not have rea-sonably foreseen being haled into court here, as the case law—notably *World–Wide Volkswagen*—requires. In *Shoppers* the defendant, a supermarket chain, placed numerous advertisements in newspapers in the District of Columbia "with the expectation" that District residents would go to its stores and purchase the products being advertised. This court concluded that, given Shoppers' "purposeful" activities directed at District of Columbia residents, it should reasonably have anticipated being haled into court here. 746 A.2d at 331.[11] Such purposeful conduct simply does not exist in this case. Since IDESA has, in the past, supplied Amtech with elevator parts, and since Amtech does business throughout the United States, the essence of appellant's argument is that IDESA should be able to foresee being sued in any state in which its parts might be used at any time in elevator maintenance. Such an argument surely does not comport with the due process requirement that the exercise of personal jurisdiction not offend "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154.

■ Appellant also argues that IDESA could have anticipated suit in the District of Columbia based on the elevator service contract itself. We note that appellant is not asserting jurisdiction based on D.C.Code § 13–423(a)(2), which speaks of "contracting to supply services in the District of Columbia." Rather, her counsel stressed in oral argument that the elevator service contract—which was entered into with the Embassy, an arm of the Department of State, a government agency whose headquarters is in the District of Columbia—supplied the minimum contacts necessary to make it foreseeable that IDE-

11. Moreover, appellant is not even a resident of the District of Columbia. Consequently, the District has little or no interest in provid-ing a forum for her claims. *See Shoppers,* 746 A.2d at 329.

SA would be haled into court here by an Embassy employee. This is indeed a creative argument, but appellant cites no authority for it, and we have found none. We agree with the Eleventh Circuit that the mere existence of a contract between a foreign corporation and a local resident is not enough to establish minimum contacts sufficient to satisfy due process. *See Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir.1986) (contract between Costa Rican company and Florida corporation insufficient to amount to "purposeful availment" of the benefits and protections of Florida law). Moreover, appellant herself was not even a party to the contract, but only an employee of the actual party, the American Embassy in Mexico City,[12] so her connection with the contract was even more remote than that of the plaintiff in *Sea Lift*. Thus we find no support for the assertion that IDESA could have anticipated being haled into court in the District of Columbia as a result of its entering into a contract with the Embassy for work to be done entirely in Mexico.

2. *The Nexus between Appellant's Claims and Appellee's Minimum Contacts with the District of Columbia*

■■■ Even if there were any basis to conclude that IDESA "transacted business" in the District of Columbia within the meaning of section 13–423(a)(1) so that it could reasonably foresee being haled into court here, appellant would still be unable to show a substantial connection between IDESA's contacts with the forum and her claim for relief. The defendant corporation in *Shoppers* deliberately solicited District residents to shop in its Mary-

land and Virginia stores. The plaintiff in that case fell and was injured in one of those stores (in Maryland) and later filed suit against Shoppers to recover damages for her injuries. Given those facts, we held that "there can be no doubt that [Shoppers'] advertising relates to or has a discernible relationship to a claim by a District resident who becomes a customer in one of Shoppers' stores and is injured." 746 A.2d at 335–336. By contrast, IDESA's alleged contacts with the District of Columbia are limited to the occasional sale of parts to Amtech several years ago for use in projects in buildings in the District of Columbia. Appellant's claim, however, is based on an alleged tort that occurred in Mexico City, Mexico. An elevator accident occurring in Mexico, allegedly caused by a Mexican company, simply cannot be said to have any relation to that company's sale of products for potential use in the District of Columbia. We find no basis in law or logic for concluding that appellant's claim arose from IDESA's contacts with the forum.

III

Appellant argues in addition that personal jurisdiction may be exercised over IDESA under theories of alter ego and apparent authority. First, she maintains that IDESA is subject to personal jurisdiction in this forum because, on the date of the elevator accident, IDESA was the alter ego of Amtech, a company that admittedly does business in the District of Columbia. Therefore, according to appellant, the court should "pierce the corporate veil" and subject IDESA to personal jurisdiction in the District of Columbia courts. Second, appellant posits that, because IDESA held itself out as Amtech's apparent agent in Mexico, and because the Em-

---

**12.** We assume for present purposes that the Embassy can be regarded as a District of Columbia resident, since it is a component part of the Department of State, which is headquartered in the District.

bassy and/or appellant relied, to their detriment, on IDESA's apparent authority, IDESA, as an "agent," was subject to personal jurisdiction wherever jurisdiction could be exercised over Amtech, the "principal." Both arguments fail.

## A. *Alter Ego*

In *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242 (D.C.1993), we held that, in order to pierce the corporate veil, "there must be a unity of ownership and interest." *Id.* at 248 (citing *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984)). There are no precise guidelines for determining when to pierce the corporate veil, but in making that determination, we consider factors such as "whether corporate formalities have been disregarded, and whether there has occurred an intermingling of corporate and personal funds, staff, and property." *Vuitch*, 482 A.2d at 816 (citation omitted). As one federal court has observed, "[a]lthough this test generally is used to reach an individual behind a corporation, this same test has been applied to pierce the corporate veil between two corporations, such as between parent [and] subsidiary corporations." *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr.*, 90 F.Supp.2d 15, 23 n. 6

(D.D.C.2000) (citation omitted). Thus, "where affiliated parties are alter egos of a corporation over which the Court has personal jurisdiction ... the corporation's contacts may be attributed to the affiliated party for jurisdictional purposes." *Id.* at 22 (citations omitted).[13]

Appellant maintains that "Amtech substituted its own technical employees for the important positions [at IDESA], paying their salaries while they worked at IDESA's factory, as all the while Amtech kept IDESA in a cash-poor, under-capitalized condition." In essence, appellant argues that IDESA is merely a corporate shell, and that it is, for all practical purposes, Amtech. The record simply does not support this assertion. Jess Benton, ABM's Executive Vice President and Chief Operating Officer, testified in his deposition that after the 1996 sale, ABM/Amtech and IDESA did not share any employees, managers, officers, office equipment, or office space. Mr. Benton also stated that IDESA and ABM/Amtech had separate bank accounts. In addition, IDESA held its own corporate meetings and paid its own taxes. There was no evidence to the contrary. Thus appellant has failed to es-

---

**13.** Appellant has insisted throughout this litigation that the issue of alter ego is for the jury to decide, and that the trial court erred in making a threshold determination that there was insufficient evidence to show that IDESA was the alter ego of ABM/Amtech for jurisdictional purposes. Indeed, appellant maintains on appeal that the court's resolution of the issue deprived her of her right to a jury trial under the Seventh Amendment to the Constitution. This argument confuses the issues. While it may be true that in many cases "the issue of whether the corporate veil should be pierced is properly submitted to a jury," *Vuitch*, 482 A.2d at 816 n. 6, the issue of personal jurisdiction is unquestionably one for the court. *Leichtman v. Koons*, 527 A.2d 745, 748 (D.C.1987). This court in *Vuitch* was reviewing the trial court's ruling on a

motion for directed verdict. The evidence in that case had already been presented, and personal jurisdiction had necessarily been established over all of the defendants. The issue of alter ego was therefore distinct from the issue of personal jurisdiction.

That is not the case here. Because the alter ego claim was part of appellant's assertion of personal jurisdiction, we hold that the trial court in the present case was correct in ruling that "the issue of personal jurisdiction is for the court, not the jury, to decide; there is no constitutional right to trial by jury on that issue." It is squarely and solely within the province of the trial court to determine whether it has personal jurisdiction over a defendant, regardless of the theory on which the plaintiff urges the court to exercise such jurisdiction.

tablish any of the *Vuitch* "factors" for determining whether one corporation is the alter ego of another.

Moreover, even if, under the Stock Purchase Agreement, IDESA and Amtech remained in a close relationship whereby IDESA used Amtech's name and logo in Mexico, supplied Amtech with elevator parts, and continued to use Amtech employees as consultants, the record does not show that there was any "unity of ownership and interest" between the corporations so that IDESA was actually Amtech's alter ego. Indeed, the United States District Court for the District of Columbia has specifically held that the joint use of trademarks and a common marketing image, along with shared executives between two companies, were "not sufficient to establish" alter ego status. *Diamond Chemical Co. v. Atofina Chemicals, Inc.,* 268 F.Supp.2d 1, 9 (D.D.C.2003); *see also Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1460 (2d Cir.1995) ("the use of the ... logo [is] not evidence that the two companies operated as a 'single economic entity' "); *AGS Int'l Services, S.A. v. Newmont USA Ltd.,* 346 F.Supp.2d 64, 84 (D.D.C.2004) ("Sodexho Alliance's authorization for SMS to use its trademark and to share revenue with SMS pursuant to their joint venture agreement are insufficient to show a unity of interest for jurisdictional purposes"). The evidence appellant cites falls far short of establishing that IDESA is Amtech's alter ego. The trial court was thus correct in holding that it did not have personal jurisdiction based on this theory.

### B. *Apparent Authority*

 Because it is undisputed that Amtech no longer owned IDESA at the time IDESA entered into its contract with the Embassy, and therefore no actual authority existed by which IDESA could be viewed as an agent of Amtech, appellant offers a theory of apparent authority. Un-der that doctrine, a court may consider whether a third party "reasonably relied upon conduct of the principal (including acquiescence) or conduct of the agent for which the principal is responsible." *Lewis v. Washington Metropolitan Area Transit Authority,* 463 A.2d 666, 670 n. 7 (D.C. 1983). The third party seeking to prove the existence of an agency relationship must show that the reliance was to his or her detriment. *Wagshal v. Selig,* 403 A.2d 338, 344 (D.C.1979).

This is the first hurdle that appellant fails to clear. Significantly, appellant has not shown detrimental reliance on any of IDESA's alleged representations that it was, in fact, Amtech. In her brief, appellant contends that not only did the Embassy rely to its detriment on IDESA's alleged representations that it was actually Amtech, but that appellant herself, as a third party beneficiary under the contract between IDESA and the Embassy, somehow relied upon the notion that IDESA was still under the control of an American company. Both arguments are flawed.

First, there is no evidence of any detrimental reliance on the part of the Embassy; on the contrary, it appears that the Embassy knew exactly with whom it was dealing. For instance, appellant points to correspondence from IDESA on Amtech letterhead as evidence that IDESA was holding itself out as Amtech, and that the Embassy therefore believed it was dealing with Amtech. There is no evidence in the record, however, that the Embassy ever entertained such a belief. Indeed, a letter to the Embassy dated September 30, 1996, from IDESA's General Director, Isauro Barrutia, which displays both the IDESA and Amtech logos, clearly states that IDESA is owned by ABF Investment Group. There is no evidence whatever that IDESA was representing itself to Embassy officials as Amtech for purposes of the

1996 contract, or that the Embassy believed it was in fact contracting with an Amtech-owned company. More importantly, appellant can point to no instance in which *she herself* relied on IDESA's alleged misrepresentations that it was ABM/Amtech. Even if she were a third party beneficiary under the contract by virtue of her status as an Embassy employee (a questionable proposition at best), the "detrimental reliance" element of apparent authority has not been shown.

Even more troublesome for appellant is the fact that we have found no case—and appellant has cited none—in which the doctrine of apparent authority has been used to establish personal jurisdiction over an apparent agent based on the conduct of the principal. We are aware that personal jurisdiction has been asserted over a principal based on the activities of an agent. As the court said in *Curtis Publishing Co. v. Cassel*, 302 F.2d 132, 137 (10th Cir. 1962):

> [A]s all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred.

It is also true that personal jurisdiction has been asserted over a subsidiary based on the activities of its parent. The court in *Farha v. Signal Companies, Inc.*, 216 Kan. 471, 532 P.2d 1330 (1975), held that " 'judicial jurisdiction over a parent corporation will give the state judicial jurisdiction over the subsidiary corporation if the parent so controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence.' " *Id.* at 481, 532 P.2d at 1339 (*quoting* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 52, Comment b, at 180–181

(1971)). But *Farha* involved an actual parent-subsidiary relationship, and *Curtis* involved an actual agency relationship, neither of which is present in the case at bar. *Curtis* and *Farha*—the two cases on which appellant principally relies—are therefore both inapposite here, for neither they nor any of the other cases cited by appellant stand for the proposition that an apparent agent may be subject to personal jurisdiction in a forum where its principal does business.

In contrast, the United States District Court for the Eastern District of Louisiana has held that "where a foreign subsidiary and a local parent have failed to maintain separate corporate identities, there is no personal jurisdiction over the foreign subsidiary without a showing that the subsidiary was 'present' in the forum through its direction and manipulation of local parental activities." *Henry v. Offshore Drilling (W.A.) Pty., Ltd.*, 331 F.Supp. 340, 343 (E.D.La.1971). This is true because, as another judge of the same court later explained in *Turan v. Universal Plan Investments, Ltd.*, 70 F.Supp.2d 671 (E.D.La. 1999), "holding a subsidiary responsible for the corporate activities of its parent corporation would offend 'traditional notions of fair play and substantial justice' because a subsidiary would be liable for activities for which they were not responsible in locations in which they lack meaningful contacts." *Id.* at 675 (citation omitted).

As we have said, there appears to be no authority directly on point, in this jurisdiction or elsewhere, on the question of whether an apparent agent is subject to personal jurisdiction based on the contacts of its principal. By extending the logic of *Turan*, however, we conclude that, just as it would be manifestly unfair to hold a subsidiary liable for activities in every jurisdiction in which its parent had minimum contacts, it is likewise unjust to hold an

apparent agent to the jurisdictional contacts of its principal. Putting aside the fact that appellant has not shown that IDESA was acting as the apparent agent of Amtech when it contracted with the American Embassy in Mexico, adopting the principle suggested by appellant would mean that IDESA would ·be subject to personal jurisdiction throughout the United States, in any forum in which Amtech does business. The consequences of such a proposition are simply too far-reaching, and would contravene the important principle announced in *World–Wide Volkswagen* and followed by the courts of the District of Columbia (and every other jurisdiction that we know of) that due process mandates that ·the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559. We hold accordingly that the trial court was correct in ruling that there was no basis for personal jurisdiction over IDESA based on the theory of apparent authority.

IV

A. *Concurrent Jurisdiction*

■■■ Appellant also contends that IDESA's contract with the Embassy, requiring it to submit to jurisdiction in the *federal* courts of the District of Columbia for disputes arising out of the contract, subjects IDESA to concurrent personal jurisdiction in the *local* courts of the District of Columbia. The cases appellant cites in support of this position, however, all stand for the proposition that a state court may assume concurrent subject matter jurisdiction—not personal jurisdiction—over a federal cause of action. *See, e.g., Tafflin v. Levitt*, 493 U.S. 455, 459, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990); *Gulf Offshore Co. v.*

*Mobil Oil Corp.*, 453 U.S. 473, 475, 484, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 505, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). Appellant erroneously equates the two kinds of jurisdiction.

The trial court acknowledged in its order that, "assuming personal jurisdiction, it would have subject matter jurisdiction over a tort claim that could be said to 'arise under'· the contract between IDESA and the Department of State." There is no authority, however, for extending such concurrent *subject matter* jurisdiction to reach those defendants over which the District of Columbia courts would not otherwise have *personal* jurisdiction. The trial court "[did] not perceive how concurrent subject matter jurisdiction over tort claims arising under a contract advances plaintiff's argument that the requirement that IDESA litigate its contract claims in a federal court here makes it foreseeable that it would be haled into court on the tort claim," and neither do we. Any claim arising under the contract with the Embassy is entirely separate and distinct from the tort claim which underlies this litigation. The contract language requiring IDESA to submit to federal jurisdiction in the District of Columbia for disputes arising under the contract do not justify an assertion of personal jurisdiction over appellee by the local courts in the instant tort action, which does not arise under the contract.

B. *Equitable Estoppel*

■■■ Finally, appellant contends that IDESA should be estopped from claiming a lack of personal jurisdiction in the courts of the District of Columbia because it allegedly misrepresented itself as a "California, USA" company in its contract with the

Embassy.[14] In light of this supposed misrepresentation, appellant allegedly searched in vain for IDESA in the state of California for the purpose of bringing this litigation. This court has held, however, that "[a] party raising equitable estoppel must show that he changed his position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act." *Nolan v. Nolan,* 568 A.2d 479, 484 (D.C.1990) (citing *Cassidy v. Owen,* 533 A.2d 253, 255 (D.C.1987)). Appellant has failed to make such a showing.

■ There is no evidence whatever that IDESA misrepresented itself as a United States company with the intention that a plaintiff in a tort action against it would search for it in the state of California, U.S.A., rather than in Baja California, Mexico. "Equitable estoppel ... 'comes into play if the defendant takes active steps to prevent the plaintiff from suing in time ....' " *East v. Graphic Arts Industry Joint Pension Trust,* 718 A.2d 153, 160 n. 21 (D.C.1998) (citation omitted). That is not what happened here. Viewed in the light most favorable to appellant, the record shows that IDESA made a typographical error in drafting the contract, but that error was later corrected as soon as it was discovered. At most, IDESA may have temporarily caused the American Embassy in Mexico City to think that IDESA was incorporated in the United States (although that seems highly unlikely). It did not make any misrepresentations to Mrs. Gonzalez, however, nor did it take any "active steps" to prevent her from suing when it wrote "California, USA" in the contract. We conclude that the doctrine of equitable estoppel is thus not appropriately raised in this case, and we see no reason to discuss it further.

V

Appellant has failed to establish that the Superior Court has either general or specific personal jurisdiction over IDESA under the District of Columbia Code. Appellant has also failed to show that IDESA should be subject to personal jurisdiction based on the theories of alter ego, apparent authority, concurrent jurisdiction based on contract, and equitable estoppel. Accordingly, the orders dismissing appellant's complaint for lack of personal jurisdiction and denying reconsideration of that dismissal are both

*Affirmed.*

---

14. The trial court did not need to reach this issue, but appellant raised it below and raises it again on appeal. Thus we address it here.